# In the United States Court of Federal Claims

**NOT FOR PUBLICATION**
**No. 01-79C**
**(Filed: March 31, 2009)**

```
* * * * * * * * * * * * * * * * * *   *
                                      *
CBS CORPORATION,                      *
                                      *
                  Plaintiff,          *
                                      *
        v.                            *
                                      *
THE UNITED STATES,                    *
                                      *
                  Defendant.          *
                                      *
* * * * * * * * * * * * * * * * * *   *
```

*Thomas A. Lemmer,* Denver, CO, for plaintiff. *Herbert L. Fenster* and *Christopher Bouquet*, Washington, DC, *Mark J. Meagher*, Denver, CO and *Eric J. Sobczak*, Pittsburgh, PA, of counsel.

*David D'Alessandris,* U.S. Department of Justice, Washington, DC, with whom were *Michael F. Hertz, Acting Assistant Attorney General* and *Jeanne E. Davidson*, *Director*, for defendant. *C. Coleman Bird*, U.S. Department of Justice, Washington, DC and *Lawrence S. Rabyne*, Defense Contract Management Agency, Manassas, VA, of counsel.

*Richard D. Bernstein*, Washington, DC, for *Amicus Curiae* General Electric Company.

**OPINION ON MOTION TO DISMISS COUNT II OF THE AMENDED COMPLAINT AND CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

**FIRESTONE,** *Judge*.

Pending before the court is the motion of the defendant ("United States" or

"government") to dismiss Count II of the amended complaint filed by the plaintiff, CBS

Corporation ("CBS" or "plaintiff"), pursuant to Rule 12(b)(1) of the Rules of the United

States Court of Federal Claims ("RCFC").[1]   The parties have also filed cross-motions for

summary judgment on Count II.  In Count II of CBS's complaint, CBS, the successor-in-

interest of Westinghouse, seeks to recover from the United States a pension deficit

adjustment for negotiated government prime contracts and subcontracts (collectively,

"contracts") awarded to Westinghouse's Electronic Systems Group ("ESG") prior to the

effective date of the original Cost Accounting Standard 413 ("CAS 413", 48 C.F.R. §

9904.413-50(c)(12) (1978).  In its motion to dismiss Count II and for partial summary

judgment, the government argues that CBS did not submit a claim for the subject pension

deficit adjustment to the contracting officer.  Thus, the government argues that the court

does not have jurisdiction over Count II of CBS's complaint because CBS did not comply

with the exhaustion requirements of the Contract Disputes Act ("CDA"), 41 U.S.C. §

605(a) (1997).   In the alternative, the government argues that it is entitled to summary

judgment on Count II on the grounds that no law, regulation, or contract provision

provides for an adjustment of pension costs attributable to pre-CAS 413 contracts.  In

CBS's cross-motion for partial summary judgment, CBS argues that the court has

---

[1]This is the third decision in this case.  Over the course of the litigation CBS has changed
names.  The claims to the contracting officer were originally filed under the name of
Westinghouse Electric Corporation ("Westinghouse"), which became Viacom, Inc. before
commencing litigation.  Viacom has since become CBS Corp.  The case name was changed at
the request of the plaintiff.  See Viacom, Inc. v. United States, 70 Fed. Cl. 649 (2006), on
reconsideration sub nom. CBS Corp. v. United States, 75 Fed. Cl. 498 (2007).

jurisdiction over Count II and that it has a right to a pension deficit adjustment for

negotiated contracts that pre-date CAS 413.  The court also has before it the brief of

amicus curiae, General Electric Company ("GE"), which was filed in support of the

government's partial summary judgment motion.  For the reasons set forth below, the

court finds that CBS failed to comply with the exhaustion requirements of the CDA, and

therefore the court does not have jurisdiction over the claim.  The court also finds, in the

alternative, that the government is entitled to summary judgment on the merits of CBS's

Count II claim on the grounds that CBS has no legal right to collect deferred pension

costs for pre-CAS 413 contracts.

## BACKGROUND FACTS

The following facts are not disputed.  CBS is the successor-in-interest of

Westinghouse, which did business with the government through ESG.  ESG was

established in 1951 and provided services for defense-related electronic systems and

subsystems until ESG's closure on December 29, 1996.  From 1951 to 1978 (prior to the

effective date of CAS 413), ESG performed firm, fixed-price ("FFP"), fixed-price

incentive ("FPI") and cost-type contracts and subcontracts for the government.  Between

January 1, 1979 and February 29, 1996 (after the promulgation of the original CAS 413

but before it was revised in 1996), ESG performed FFP and cost-type contracts for the

government.[2]  Prior to the implementation of the CAS, Westinghouse's government

contracts included the standard contract clauses in effect when the contracts were formed.

It is not disputed that Westinghouse maintained two pension plans and that the

government periodically audited Westinghouse's accounting of costs associated with

Westinghouse's Qualified Pension Plan ("WPP")[3] and Westinghouse's Executive Pension

Plan ("WEPP"),[4] pursuant to certain clauses included in the Westinghouse contracts.  The

government did not object to Westinghouse's practice of accounting for pension costs at

the time.  In addition, the government does not dispute that for a period prior to the

promulgation of CAS 413, Westinghouse allocated pension costs to various divisions,

including ESG, to enable each division to allocate pension costs to its contracts.

Furthermore, between 1951 and 1996, Westinghouse used an accrued benefit cost method

to measure and assign the cost of the WPP on a composite basis with the knowledge of

the government.  During the same period, ESG also measured and assigned a composite

cost of the WEPP using an accrued benefit cost method.

---

[2]The government disputes that ESG performed FPI contracts during this period.  However, this court has previously addressed this issue and determined that ESG performed FPI contracts in Viacom, Inc. v. United States, 70 Fed. Cl. 649, 653 (2006).

[3]It is not disputed that during the period of 1951 to 1996, the WPP was a defined benefits pension plan under the Internal Revenue Code ("IRC") and that effective January 1, 1975, the WPP was a qualified plan under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461 (1993).

[4]During the period of 1951 to 1996, the WEPP was a nonqualified defined benefit pension plan under the IRC and ERISA (subsequent to ERISA's enactment in 1974).

After the promulgation of CAS 413, Westinghouse classified ESG as a segment for CAS-compliance purposes.  On February 29, 1996, Westinghouse sold substantially all of ESG to Northrop Grumman ("Northrop"), and both the government and Westinghouse considered the sale to be a segment closing under the applicable contract provisions and CAS 413.

Pursuant to the purchase agreement between Westinghouse and Northrop, Westinghouse retained the pension assets and benefit obligations for inactive pension participants.  After the sale, Westinghouse no longer entered into government contracts through ESG.  At the time of ESG's sale, there existed deficits in the WPP and WEPP because pension plan liabilities of WPP and WEPP allocable to ESG exceeded the pension plan assets of the WPP and WEPP allocable to ESG.

On July 12, 1996, Westinghouse submitted a claim for payment of $134,548,886 for the costs related to the WPP due to the closure of ESG.  On July 12, 1996, Westinghouse also submitted a claim for payment of $21,867,856 for the costs related to the WEPP due to the closure of ESG.  The amount for WEPP was later revised to $15,619,618.

The claim submitted by Westinghouse for the WPP stated, "This is a claim for the payment of $134,548,886 for all CAS-covered contracts requiring 1996 performance." Letter from James F. Davis to Thomas P. Smith regarding the WPP claim (July 12, 1996) ("WPP claim").  Westinghouse included in its WPP claim pension costs incurred from

ESG's inception in 1951.  CBS (the successor-in-interest of Westinghouse) concedes that its original demand for payment was based solely upon CAS 413.  Ptf.'s Resp. to Def.'s Proposed Findings of Uncontroverted Fact ("Ptf.'s Resp. to DPFUF") ¶ 2.[5]

Similarly, Westinghouse characterized its claim with regard to the WEPP as a "claim and demand for payment of $21,867,856 under the general provisions of [CAS] 413 and specifically [CAS 413-50(c)(12),] 48 C.F.R. 9904.413-50(c)(12)[ (1995)]."[6] Letter from James F. Davis to Thomas P. Smith regarding the WEPP claim (July 12, 1996) ("WEPP claim").  Again, Westinghouse specified that the WEPP claim was for payment for "all CAS-covered contracts requiring 1996 performance."  Id.  Westinghouse included in its WEPP claim pension costs dating back to the inception of ESG in 1951. CBS concedes that its original demand for payment was based solely upon CAS 413. Ptf.'s Resp. to DPFUF ¶ 3.[7]

---

[5] Ptf.'s Resp. to DPFUF ¶ 2 states, in pertinent part, "CBS admits that its claim with regard to the WPP stated that it was a 'claim and demand for payment . . . under the general provisions of [CAS] 413.'  CBS also admits that the claim requested payment under 'all CAS-covered contracts requiring 1996 performance.'" (quoting Def.'s Proposed Findings of Uncontroverted Fact ("DPFUF") ¶ 2 (further quotation omitted)).

[6] CAS 413-50(c)(12) states:

> If a segment is closed, if there is a pension plan termination, or if there is a curtailment of benefits, the contractor shall determine the difference between the actuarial accrued liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated. The difference between the market value of the assets and the actuarial accrued liability for the segment represents an adjustment of previously-determined pension costs.

[7] Ptf.'s Resp. to DPFUF ¶ 3 states, in pertinent part, "CBS admits that its claim with regard to the WEPP stated that it was a 'claim and demand for payment . . . under the general provisions of

The government does not dispute that the Defense Contract Audit Agency and the

Defense Contract Management Agency reviewed Westinghouse's CAS 413 claims for an

adjustment to deferred WPP and WEPP costs and did not comment upon, or take

exception to, Westinghouse's inclusion of that portion of the pension deficit that was

allocable to contracts entered into before CAS 413 became effective.

Briefing on the present motions was completed on January 29, 2009.

## DISCUSSION

### I.    Standards of Review

### A.    Motion to Dismiss Under RCFC 12(b)(1)

The government has moved to dismiss Count II of CBS's complaint for lack of

subject matter jurisdiction under RCFC 12(b)(1).  In reviewing a motion to dismiss,

"[f]actual allegations must be enough to raise a right to relief above the speculative level,

on the assumption that all the allegations in the complaint are true (even if doubtful in

fact)." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007) (internal citations

omitted); see also Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir. 1997); Henke

v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995) ("[T]he court [is] obligated to assume

all factual allegations to be true and to draw all reasonable inferences in plaintiff's

favor."). See generally Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other

grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-15 (1982); Reynolds v. Army & Air

[CAS] 413.'  CBS also admits that the claim requested payment under 'all CAS-covered
contracts requiring 1996 performance.'" (quoting ("DPFUF") ¶ 3 (further quotation omitted)).

Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988).  The plaintiff, however, bears the

burden of establishing subject matter jurisdiction.  Alder Terrace, Inc. v. United States,

161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing McNutt v. Gen. Motors, 298 U.S. 178, 189

(1936)).  See also Blueport Co., LLC v. United States, 533 F.3d 1374, 1381 (Fed. Cir.

2008).  The plaintiff must do so by a preponderance of the evidence.  Toxgon Corp. v.

BNFL, Inc., 312 F.3d 1379, 1383 (Fed. Cir. 2002) ("In a Rule 12(b)(1) motion, the

plaintiff bears the burden to show by a preponderance of the evidence that the district

court has subject matter jurisdiction.");  Reynolds, 846 F.2d at 748.  When the government

challenges the jurisdiction of the court over the claim for relief, the plaintiff cannot rely

on mere allegations in the complaint but must come forward with relevant, competent

proof to establish jurisdiction.  McNutt, 298 U.S. at 189; see also Banks v. United States,

314 F.3d 1304, 1310 (Fed. Cir. 2003), Alder Terrace, 161 F.3d at 1377.  Because

jurisdiction is a threshold matter, a case can proceed no further if a court lacks

jurisdiction to hear it.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94

(1998); see also Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006) ("[W]hen a federal

court concludes that it lacks subject-matter jurisdiction, the court must dismiss the

complaint in its entirety." (citation omitted)).  See generally John R. Sand & Gravel v.

United States, 128 S. Ct. 750 (2008).

    This court has jurisdiction under the CDA to consider certain claims.  41 U.S.C. §

609 (1994).  In particular, this court has jurisdiction to consider claims that have been

made to a contracting officer where either a decision has been issued by the contracting

officer or the contracting officer has failed to issue a decision within the time specified by

statute. Id.; see also 41 U.S.C. § 605(c)(5) (1997), England v. The Swanson Group, 353

F.3d 1375, 1379 (Fed. Cir. 2004) ("Upon the issuance of a contracting officer's final

decision on a claim, the contractor has the choice to appeal either to the appropriate board

of contract appeals or to the Court of Federal Claims.").

      **B.**       **Cross-Motions for Summary Judgment**

Summary judgment is appropriate when "the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to

any material fact and that the movant is entitled to judgment as a matter of law." RCFC

56(c)(1); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Casitas

Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008). In considering

a motion for summary judgment, the court's role is not to "weigh the evidence and

determine the truth of the matter but to determine whether there is a genuine issue for

trial." Liberty Lobby, 477 U.S. at 249. "The evidence of the nonmovant is to be

believed, and all justifiable inferences are to be drawn in his favor." Id. at 255; see also

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Casitas

Mun. Water Dist., 543 F.3d at 1283. "As to materiality, . . . [o]nly disputes over facts that

might affect the outcome of the suit under the governing law will properly preclude the

entry of summary judgment." Liberty Lobby, 477 U.S. at 248. In addition, an issue of

material fact is only genuine "if the evidence is such that a reasonable [finder of fact]

could return a verdict for the nonmoving party." Id.

**II.     Count II of CBS's Complaint Must Be Dismissed for Lack of Jurisdiction.**

Here, Westinghouse presented two claims to the contracting officer for a final

decision.  One claim was made in connection with the pension deficit associated with the

WPP.  The other was made in connection with the pension deficit associated with the

WEPP.  Both claims stated that they were submitted for payment "under the general

provisions of [CAS] 413, . . . and specifically, [CAS] 413-50(c)(12)."  See WPP Claim,

WEPP Claim.  Based on the plain language of the claims, it is clear that CBS did not

present a separate claim for any pre-CAS 413 contracts to the contracting officer.

Nonetheless, CBS argues that it did not need to make a separate claim for pre-CAS 413

contracts because its claim for pre-CAS 413 pension costs is simply a "subset" of its CAS

413 contract claims and is based on the same underlying facts.  In support of this view,

CBS relies on various Court of Federal Claims and Federal Circuit cases that have

recognized a contractor's right to modify a CDA claim, in court, where the "essence of

the claim" is based on the same operative facts of the claim presented to the contracting

officer.  Pl.'s Opp'n to Def.'s Mot. Dismiss and Cross-Mot. on Count II ("Pl.'s Opp'n")

at 4-5 (citing Northrop Grumman Info. Tech., Inc. v. United States, 535 F.3d 1339, 1343

(Fed. Cir. 2008); Scott Timber Co. v. United States, 333 F.3d 1358, 1365-66 (Fed. Cir.

2003); ATK Thiokol, Inc. v. United States, 76 Fed. Cl. 654, 659-60 (2007); Hardwick

Bros. Co., II v. United States, 26 Cl. Ct. 884, 888 n.4 (1992), rev'd on other grounds, 72

F.3d 883 (Fed. Cir. 1995), on remand 36 Fed. Cl. 347 (1996); Cerberonics, Inc. v. United

States, 13 Cl. Ct. 415, 417 (1987)).

In this connection, the Federal Circuit has held that a contractor "may not raise any

new claims not presented and certified to the contracting officer." Santa Fe Eng'rs, Inc.

v. United States, 818 F.2d 856, 858 (Fed. Cir. 1987) (citation omitted) (emphasis added).

Under Federal Circuit law, in order to proceed, the contractor must demonstrate that it

gave "the contracting officer a clear and unequivocal statement that gives the contracting

officer adequate notice of the basis and amount of the claim." Contract Cleaning Maint.,

Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987) (emphasis added), (citing

Tecom, Inc. v. United States, 732 F.2d 935, 936-37 (Fed. Cir. 1984); Metric Const. Co.,

Inc. v. United States, 1 Cl. Ct. 383, 392 (1983)). See also SMS Data Prods. Group, Inc. v.

United States, 19 Cl. Ct. 612, 616-17 (1990). Tested by these standards, the court agrees

with the government that this court does not have jurisdiction over Count II of CBS's

amended complaint.

CBS argues that its pre-CAS claim is not "new" because it arises from the same set

of operative facts as its CAS 413 claims, which were based on its 1996 CAS-covered

contracts. More specifically, CBS argues that Count II involves the same operative facts

as those presented to the contracting officer, namely:

 (a) pension plans . . . existed during the period 1951 to 1996; (b) [government
 contracts were performed] during the period 1951 to 1996; (c) pension costs

[were] attributable to the government contracts performed during the period 1951 to 1996; (d) [ESG closed] in 1996; and (e) [Westinghouse had pension] deficits and a prepayment credit as of closure in 1996.

Pl.'s Opp'n. Br. at 5.

While CBS relies on the above-cited "operative facts" to support jurisdiction, CBS goes on to argue on the merits of its Count II claim that its right to pre-CAS 413 pension costs actually turns on the existence of an "implied agreement" between the government and Westinghouse in which the government agreed to pay to Westinghouse any pension deficit attributable to deferred pension costs under ESG's pre-CAS 413 contracts. As CBS states, Count II is "based on the fact that contracts existed between [Westinghouse] and the government which contained mandatory clauses supporting an implied obligation to adjust pension deficit costs and allocate those costs to a cost type contract in the year deferral is no longer possible." Pl.'s Surreply at 8 (emphasis in original). CBS argues that the implied agreement arises from various government-approved accounting practices that allowed Westinghouse to defer pension payments and then claim them once the segment was closed. Pl.'s Opp'n at 1. It is undisputed that Westinghouse did not bring any of these "implied obligations" to the attention of the contracting officer, nor did Westinghouse quantify its pre-CAS 413 claim for the contracting officer.

Having reviewed CBS's contentions, the court agrees with the government that CBS's claim for pre-CAS 413 pension costs based on an "implied agreement" was not included within CBS's CAS 413 claim but is, in fact, a separate claim that was never

submitted to the contracting officer for approval.  Contrary to CBS's contentions, this

court finds that CBS's CAS 413 claims and pre-CAS 413 claim do not share the same

basis.  CBS's claim to post-CAS 413 pension costs is based on its 1996 CAS 413-covered

contracts, which by their terms incorporate the CAS 413 segment closing adjustment.  In

contrast, CBS's pre-CAS 413 claim involves different contracts and different accounting

practices that were not identified in the CAS 413 claims.  Westinghouse did not identify

for the contracting officer any provisions in its pre-CAS 413 contracts that would have

put the contracting officer on notice that Westinghouse understood that it was entitled to

an adjustment of deferred pension costs at the time of the segment closing based solely

upon those pre-CAS 413 contracts.  Nor was any "implied agreement" metioned before

the CO.  Instead, as noted above, Westinghouse's WPP & WEPP claims to the CO were

based, by their own terms, on CAS 413.  See WPP Claim; WEPP Claim.  Similarly,

Westinghouse did not provide the contracting officer with any calculation regarding its

pre-CAS 413 pension cost claim.  In these circumstances, Westinghouse did not give the

contracting officer the opportunity to consider the basis or the amount of its pre-CAS 413

claim.  The Federal Circuit has made it clear that the contracting officer is entitled to a

"clear and unequivocal statement . . . of the basis and amount of the claim" before this

court may assume jurisdiction over the claim.  Contract Cleaning, 811 F.2d at 592.  Here,

CBS failed to provide a clear and unequivocal statement of either the basis or amount of

its pre-CAS pension cost claim.  As such, Count II must be dismissed for lack of

jurisdiction.

### III.    The <u>Teledyne</u> Decision Bars CBS's Claim for a Pre-CAS Segment Closing Adjustment.

For the reasons set forth above, the court has determined that it does not have jurisdiction over Count II of CBS's complaint.  However, even if the court had jurisdiction, Count II of CBS's complaint would nonetheless be foreclosed under well-settled principles of stare decisis.

In <u>Teledyne, Inc. v. United States</u>, 50 Fed. Cl. 155 (2001) ("<u>Teledyne</u>"), this court held, and the Federal Circuit agreed, that any "pension surplus or deficit attributable to contracts that pre-date the original CAS 413 [promulgated in 1978] must be excluded from the CAS 413 segment closing adjustment" on the grounds that including pre-CAS 413 pension costs in a CAS 413 segment closing adjustment "would amount to a government-mandated change in accounting practices . . . ."  <u>Teledyne</u>, 50 Fed. Cl. at 183, 184, <u>aff'd sub nom</u> <u>Allegheny Teledyne, Inc. v. United States</u>, 316 F.3d 1366, 1383-84 (Fed. Cir. 2003) ("<u>Allegheny Teledyne</u>").  This court based its holding on the fact that prior to promulgation of the original CAS 413 segment closing provision, the government had no legal basis for adjusting previously-determined pension costs authorized under a standard government contract.  <u>Teledyne</u>, 50 Fed. Cl. at 184.  This view was then affirmed by the Federal Circuit.  <u>Allegheny Teledyne</u>, 316 F.3d at 1383-84.  Indeed, the regulatory history of the original CAS 413 makes plain that the segment closing provision was added to ensure that when a segment closed, an adjustment would be made. As the

CAS Board explained in the preamble to CAS 413, "[A] problem arises in cases where a segment is closed. Because there are no future[ accounting] periods in which to adjust previously-determined pension costs applicable to that segment, a means must be developed to provide a basis for adjusting such costs.  CAS 413 Preamble 12, "Closing of a segment." 42 Fed.Reg. 37,191, 37,195 (July 20, 1977) at Ex. 6 to Br. for GE as Amicus Curiae Supporting Def. ("GE Br.").  This provision of CAS 413 would not have been needed if the ability to adjust previously-determined pension costs already existed under standard government contract clauses.  Thus, the Teledyne and Allegheny Teledyne decisions make plain that prior to promulgation of CAS 413 in 1978, there was no general authority for adjusting previously-determined pension costs at the time of a segment closing.  This court is, of course, bound by this Federal Circuit precedent and cannot deviate from the Circuit's ruling.  Crowley v. United States, 398 F.3d 1329, 1335 (Fed. Cir. 2005) ("[T]he Court of Federal Claims may not deviate from the precedent of the United States Court of Appeals for the Federal Circuit any more than the Federal Circuit can deviate from the precedent of the United States Supreme Court.").

Although CBS contends that general contract provisions in its pre-CAS 413 contracts authorized and provided for a segment closing adjustment, CBS argues that it is not seeking to overturn the Federal Circuit's Allegheny Teledyne decision.  Instead, CBS contends that the holding in Teledyne does not preclude its present claim because "the Teledyne decisions did not address the issue of entitlement to pension costs under any

15

legal theory other than the CAS."  Pl.'s Opp'n at 7.

Upon examination of the relevant opinions, however, it is clear that CBS's

argument regarding the scope of the Teledyne decisions is based on a misreading of the

those decisions.  More specifically, as discussed above, the decision that the CAS 413

adjustment did not include pre-CAS contract costs was based on the conclusion that the

inclusion of pre-CAS contract costs would result in an accounting change.  Teledyne, 50

Fed. Cl. at 183.  The Circuit adopted this reasoning in its opinion.  Allegheny Teledyne,

316 F.3d at 1383-84.  Therefore, the Circuit necessarily determined that there was no

basis for a pension cost adjustment under the standard government contract provisions

before the promulgation of CAS 413.  Indeed, CBS's immediate predecessor-in-interest,

Viacom Inc. (which, in turn, was the successor-in-interest of Westinghouse), attempted to

dissuade the Circuit of this view when it filed a brief as an amicus curiae in the Federal

Circuit in the Teledyne case.  In its brief, Viacom argued that prior to promulgation of the

original CAS 413, in 1978, existing accounting standards, and in particular Accounting

Principles Board Opinion No. 8 ("APB-8"), required recognition of "any previously

unamortized actuarial gain or loss" upon a segment closing.  See Br. for Viacom, Inc. as

Amicus Curiae Supporting Appellant, Allegheny Teledyne, 316 F.3d 1366 (Nos. 02-5008,

02-5009, 02-5010, 02-5011), at 18 (Ex. 3 to GE Br.).  The Federal Circuit, however,

rejected this argument when it held that CAS 413 amounted to a change in accounting

practice from the pre-CAS 413 accounting practice.  Allegheny Teledyne, 316 F.3d at

1383-84.  This court is bound by the Circuit's ruling and is not free to now adopt a view

rejected by the Federal Circuit.[8]  Thus, under traditional principles of stare decisis, this

court must grant the government's motion for summary judgment.

**CONCLUSION**

For the above-stated reasons, the court **GRANTS** the government's motion to

dismiss Count II of CBS's complaint.  In the alternative, the government's motion for

partial summary judgment is **GRANTED**.  Plaintiff's motion for partial summary

judgment is **DENIED**.

   **IT IS SO ORDERED**.

                              s/Nancy B. Firestone
                              NANCY B. FIRESTONE
                              Judge

---

[8]CBS argues in its motion for partial summary judgment in the present case that APB-8 provided for an adjustment of previously-recognized pension costs upon the closure of the ESG segment without regard to CAS 413.  See Pl.'s Opp'n at 9-13.  This is essentially the same argument it made before the Circuit in Allegheny Teledyne.