# In the United States Court of Federal Claims

**No. 01-79C**
**(Filed: December 8, 2009)**

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * | * |
| | * |
| CBS CORPORATION, | * **Government's Segment Closing** |
| | * **Payment under the Allowable Cost** |
| Plaintiff, | * **and Payment Clause Where the** |
| | * **Segment Closing Calculation Involves** |
| v. | * **a Pension Deficit and a Portion of the** |
| | * **Pension Deficit is Transferred from** |
| THE UNITED STATES, | * **the Segment Seller to Segment Buyer;** |
| | * **Allowable Cost and Payment Clause,** |
| Defendant. | * **FAR 52.216-7; Allowability Clause,** |
| | * **FAR 31.201-2; Generally Accepted** |
| * * * * * * * * * * * * * * * * * * | * **Accounting Principles ("GAAP")** |

*Thomas A. Lemmer,* Denver, CO, for plaintiff. *Herbert L. Fenster*, of Washington, DC, *Mark J. Meagher and Arash Heidarian,* of Denver, CO and *Eric J. Sobczak*, Pittsburgh, PA, of counsel.

*David D'Alessandris,* U.S. Department of Justice, Washington, DC, with whom were *Tony West, Assistant Attorney General* and *Director Jeanne E. Davidson*, for defendant. C. Coleman Bird, U.S. Department of Justice, Washington, DC and *Lawrence S. Rabyne*, Defense Contract Management Agency, Arlington Heights, IL, of counsel.

*Richard D. Bernstein*, Washington, DC, for *Amicus Curiae*, General Electric Company. *Howard J. Stanislawski*, Washington, DC and *Alan C. Brown*, McLean, VA, of counsel.

## O P I N I O N

This is another in a series of decisions involving the segment closing calculations

triggered by the sale and closing of two CBS Corporation ("CBS") business segments

under original Cost Accounting Standard ("CAS") 413.50(c)(12), 4 C.F.R. § 413(c)(12)

(1994) ("original CAS 413"), and the revised version of this provision, found at 48 C.F.R. § 9904.413-50(c)(12) (1995) ("revised CAS 413"). CBS and the defendant, the United States ("government") have filed cross-motions for partial summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), which require this court to determine first the scope of the segment closing adjustment and then the government's payment obligation with regard to the closing of one of these segments, the Electronic Systems Group ("ESG").[1]

The segment closing calculation at issue in the parties' cross-motions was triggered by the sale of ESG to Northrop Grumman Corporation ("Northrop Grumman") in 1997. The segment closing calculation revealed that ESG's pension assets were not sufficient to meet ESG's pension liabilities and therefore ESG had a pension deficit. In the court's prior decision, the court held that the government was liable to CBS for the share of the pension deficit attributable to CAS-covered federal government contracts. Viacom, Inc. v. United States, 70 Fed. Cl. 649, 655, 660 (2006). However, the court did not address whether the segment closing calculation must include the pension assets and

---

[1] Prior to today, the court has issued two decisions in this case. Previously, the court granted-in-part and denied-in-part the government's motion for partial summary judgment on whether the government was liable under CAS 413 for a portion of the pension plan deficit retained by CBS following the segment closing. Viacom, Inc. v. United States, 70 Fed. Cl. 649 (2006), amended by CBS Corp. v. United States, 75 Fed. Cl. 498 (2007). During the pendency of this litigation, Viacom, Inc. changed its name to CBS. The court also issues today a decision regarding the segment closing date to be used in conducting a CAS 413 segment closing calculation with regard to the closing of another CBS segment, the Machinery Technology Division. See CBS Corp. v. United States, No. 01-79 (Fed. Cl. Dec. 8, 2009) (opinion regarding segment closing date).

liabilities transferred to Northrop Grumman or the extent of the government's liability where pension assets and liabilities are transferred in a segment sale.  In particular, the court did not address whether CBS could seek payment from the government for the portion of the ESG pension deficit that CBS transferred to Northrop Grumman in connection with the ESG sale.

CBS argues in the pending motion that the transferred pension assets and liabilities must be included in the segment closing calculation and that the government is liable to it for the government's share of the pension deficit that CBS both retained and transferred to Northrop Grumman, the segment buyer.  CBS agrees that if it succeeds in this motion, it must transfer some of the amount it receives to Northrop Grumman, but argues that it is entitled to keep some portion of the payment attributable to the transferred pension deficit.[2]

The government argues that the segment closing calculation should not include any of the pension assets or liabilities transferred to Northrop Grumman.  In the alternative,

---

[2]At oral argument, council for CBS, Thomas A. Lemmer ("Mr. Lemmer"), explained that any payment to CBS would account for any "windfalls that come out of [the segment closing] process," including those that result where the government ultimately pays less than 100% of the transferred deficit (as illustrated in n.8 infra).  Tr. of Oral Argument ("Tr.") 30:8, Nov. 19, 2009; see also Tr. 43:15-22 (Mr. Lemmer states that a key component of determining the government's payment obligation is to "take a look at all the windfalls, all the wipeouts.").  Mr. Lemmer also explained that "government benefit from the application of CAS 413 should be considered in looking at what is ultimately owed to the parties," accounting for other liabilities from which the government was released as a result of the segment closing, Tr. 45:5-11.  See, e.g., Tr. 43:7-11 (Mr. Lemmer states, "There are real liabilities, pre-CAS [contracts are] the example, that the government is not going to pay.  CBS has funded those liabilities.")

the government argues that even if the segment closing calculation is performed on all of

ESG's pension assets and liabilities at the time of the segment closing, including those

transferred to Northrop Grumman as part of the ESG sale, CBS can only seek

reimbursement for the portion of the pension deficit that CBS retained after the sale.  The

government argues that under the Allowable Cost and Payment Clause, Federal

Acquisition Regulation ("FAR") 52.216-7, 48 C.F.R. § 52.216-7 (2002),[3] CBS cannot

claim reimbursement for pension costs attributable to the pension deficit CBS transferred

to Northrop Grumman as part of the ESG sale.

For the reasons set forth below, the court holds that the CAS 413 segment closing

calculation must include all of the pension assets and liabilities of the ESG segment at the

time of the segment closing for pension costs attributable to contracts subject to original

CAS 413, including those assets and liabilities that were transferred to Northrop

Grumman.[4]  The court further holds that CBS is entitled to seek pension costs from the

---

[3]The Allowable Cost and Payment Clause provides, in relevant part, "The Government will make payments to the Contractor . . . in amounts <u>determined to be allowable</u> by the Contracting Officer in accordance with [FAR] subpart 31.2[, 48 C.F.R. §§ 31.201 - 31.205 (2005)] . . . ."  FAR 52.216-7(a)(1), 48 C.F.R. § 52.216-7(a)(1) (2002) (emphasis added).

In turn, FAR 31.201-2 provides, in pertinent part, "A cost is allowable only when the cost complies with all of the following requirements: . . . (3) Standards promulgated by the CAS Board, if applicable, otherwise, generally accepted accounting principles and practices appropriate to the circumstances."  FAR 31.201-2(a), 48 C.F.R. § 31.201-2(a) (2005).

[4]The segment closing adjustment in this case occurred under revised CAS 413 because the sale to ESG took place after the revised CAS went into effect in 1995.  However, because revised CAS 413 represents a change from original CAS 413, the rules contained in original CAS 413 apply with respect to the pension costs attributable to contracts entered into under the original CAS.  <u>See generally</u>, <u>Viacom</u>, 70 Fed. Cl. at 662-63 (discussing the history of the ESG segment closing and which version of CAS 413 applies to which contracts).  In short, the

government only for the portion of the pension deficit retained by CBS.

## UNDISPUTED FACTS

The following facts are not disputed.  CBS's predecessor, Westinghouse Electric Company ("Westinghouse"),[5] had a business segment known as ESG that performed CAS-covered firm-fixed price, fixed-price incentive and cost-type contracts for the government.  ESG was established in 1951 to provide services for defense-related electronic systems and subsystems.

Most of ESG's employees were covered under the Westinghouse Qualified Pension Plan ("WPP"), a qualified pension plan under the Employee Retirement Income Security Act ("ERISA") and the Internal Revenue Code ("IRC").  ESG executives were covered under the Westinghouse Executive Pension Plan ("WEPP"), which was a non-qualified plan under ERISA and the IRC.

After the promulgation of the CAS in the mid-1970s, Westinghouse classified ESG as a "segment" for CAS-compliance purposes with the knowledge and approval of the government.  ESG's government contracts required compliance with CAS 413 and at least seven of ESG's contracts were subject to revised CAS 413, 48 C.F.R. § 9904.413 due to the fact that they were entered into after revised CAS 413 was promulgated.  In

---

contracts involved in the segment closing that were entered into before CAS 413 was revised are subject to original CAS 413's segment closing provisions, while the others are subject to revised CAS 413's provisions.

[5]Westinghouse became Viacom, which, in turn, became CBS.

addition, ESG's cost-type contracts issued after the implementation of the Allowable Cost and Payment Clause, FAR 52.216-7, 48 C.F.R. § 52.216-7, contained that clause, which governs which costs incurred in performance of a cost-type government contract (including pension costs) are reimbursable.

In February 1996, Westinghouse sold the ESG segment to Northrop Grumman. This sale constituted a segment closing and triggered a CAS 413 segment closing calculation.  As part of the ESG sale, Westinghouse also transferred certain WPP and WEPP pension assets and liabilities to Northrop Grumman while retaining the remaining WPP and WEPP pension assets and liabilities.

In July 1996, Westinghouse submitted segment closing claims to the government for the pension deficits in the WPP and WEPP purportedly attributable to ESG (i.e., pension costs incurred for those workers while performing government contracts).  In July 1997, Westinghouse submitted a revised segment closing claim for the WEPP.

In both the 1996 segment closing claims and the 1997 revisions to the WEPP claim, CBS calculated the segment closing adjustment amount based upon the pension assets and liabilities retained by Westinghouse at the time of the segment closing.  CBS further stated that these claims were made pursuant to revised CAS 413, 48 C.F.R. § 9904.413.

On April 30, 1998, CBS, Northrop Grumman and the government entered into a novation agreement, which provided that Northrop Grumman would assume all

obligations and liabilities associated with ESG's government contracts, including pension liabilities.

In July 1999, Northrop Grumman merged the pension assets and liabilities CBS transferred to it with an existing Northrop Grumman pension plan.  It is not disputed that Patrick Ring, an actuary for the Defense Contract Management Agency, sent a memorandum to the Defense Corporate Executive in which he stated that "the advantages clearly outweigh any disadvantages of merging the pension plans.  The pension assets of the merged plan will continue to provide a huge cushion against future experience losses."  Ex. 4 to Ptf.'s Proposed Findings of Uncontroverted Fact (Memorandum from Patrick Ring to Defense Corporate Executive (July 2, 1999)).

On June 8, 2009, CBS submitted revised segment closing adjustment calculations to the government.  In the revised calculations, CBS calculated the segment closing adjustment by subtracting total assets from total liabilities for both pension plans. CBS performed other adjustments to the ESG gross deficit (the combined deficit for both the transferred and retained pension plans) to remove pre-CAS and fixed-price contracts before arriving at its purported final segment closing adjustment amount.  The final adjustment CBS seeks from the government includes the portion of the pension deficit that CBS transferred to Northrop Grumman.

**DISCUSSION**

I.      **Standard of Review**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  RCFC 56(c)(1); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008); Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1323 (Fed. Cir. 2001) (citation omitted).  In considering a motion for summary judgment, the court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Liberty Lobby, 477 U.S. at 249.  "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. at 255; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Lathan Co., Inc. v. United States, 20 Cl. Ct. 122, 125 (1990); Casitas Mun. Water Dist., 543 F.3d at 1283.

II.     **The Segment Closing Calculation Must Be Performed For CAS-Covered Contracts Containing Original CAS 413 on All of the Segment's Pension Assets and Liabilities at the Time of the Segment Closing.**

The cross-motions in this case address two distinct issues: first, the scope of the segment closing calculation under CAS 413 and second, the segment closing payment obligation triggered by the calculation.  As the court noted in an earlier decision involving

similar segment closing issues, "In evaluating the meaning of the original CAS

413.50(c)(12), the Federal Circuit has held that the court must be guided by the [CAS

Board's ("CASB's")] intent in promulgating the standard."  Gen. Electric Co. v. United

States, 84 Fed. Cl. 129, 140 (2008) ("GE II") (citing Perry v. Martin Marietta Corp., 47

F.3d 1134, 1137 (Fed. Cir. 1995) ("[O]ur task in interpreting the meaning of these . . .

provisions is ultimately to ascertain the CASB's intended meaning when it promulgated

the CAS.")).  As the Federal Circuit explained in Allegheny Teledyne v. United States,

316 F.3d 1366, 1373 (Fed. Cir. 2003):

> When interpreting provisions of the CAS our task is "to ascertain the [Board's]
> intended meaning when it promulgated the CAS."  Perry v. Martin Marietta
> Corp., 47 F.3d 1134, 1137 (Fed. Cir. 1995). . . . We accomplish this by first
> looking at the text of the relevant provisions and "any guidance that the
> [Board] has published to aid in interpretation."  Id. at 1138.  We examine the
> issues . . . through this interpretive lens.

In contrast, however, in determining what is owed following a CAS 413

calculation, the court looks to principles of contract law.  For these, the court must look to

the FAR and, for guidance, to agency interpretations thereof.  See Boeing N. Am. v.

Roche, 298 F.3d 1274, 1280 (Fed. Cir. 2002) ("Cost allocability here is to be determined

under the [CAS] . . . . Allowability of a cost is governed by the FAR regulations, i.e., the

cost principles expressed in Part 31 of the FAR and pertinent agency supplements."

(emphasis added)); see also GE II, 84 Fed. Cl. at 147-49 (holding that the issue of the

payment obligation "does not involve a question of CAS interpretation").  It is against this

legal backdrop that the court looks at the two issues in the case.

In GE II, 84 Fed. Cl. at 142-43, this court addressed at length the scope of the

segment closing calculation for segment closings conducted under original CAS 413 and

concluded that a segment closing calculation under original CAS 413 must be made on all

of the segment's pension assets and liabilities, including the portion of the segment's

pension assets and liabilities that the segment seller transfers to the segment buyer.  The

court noted that unlike revised CAS 413, which limits the calculation to the portion of the

pension assets and liabilities retained by the segment seller, see CAS 413.50(c)(12)(v), 48

C.F.R. § 9904.413-50(c)(12)(v), original CAS 413 did not distinguish between the portion

of the pension assets and liabilities retained by the segment seller and the portion of the

pension assets and liabilities transferred to a segment buyer.  Id. at 142-43.  The court

explained that therefore, segment closing calculations under original CAS 413 must be

performed on the pension assets and liabilities of the entire segment without regard to the

fact that some of these pension assets and liabilities were transferred to the segment

buyer.  Id.

In its motion for partial summary judgment, the government argues that the court

should not apply the GE II holding to this case because it believes that decision is

incorrect.  Alternatively, the government asserts that GE II does not apply because it deals

with segment closings involving a pension surplus, whereas the instant case involves a

pension deficit.

The government has not provided the court with any reason to revisit its holding in

GE II with regard to the scope of the segment closing calculation on the grounds that this

case deals with a pension deficit.  Regardless of whether the segment closing calculation

of the segment's pension assets and liabilities reveals a pension surplus or a pension

deficit, the segment closing calculation required by original CAS 413 does not limit the

calculation to pension assets and liabilities retained by the segment seller.  The court will

not repeat that discussion here.  See generally GE II, 84 Fed. Cl. at 141-44 (discussing

this issue).  The court therefore holds that the segment closing calculation for the sale of

the ESG segment to Northrop Grumman with respect to contracts covered by original

CAS 413 must include all of the segment's pension assets and liabilities attributable to

those contracts, without adjustment for the pension assets and liabilities transferred to

Northrop Grumman.

     This, however, does not end the court's inquiry.  As discussed below, the court

now turns to the extent of the government's payment obligation where, as here, a portion

of the pension deficit attributable to contracts incorporating original CAS 413 was

transferred to the segment buyer, Northrop Grumman.

**III.    The Government's Payment Obligation to CBS is Limited to the
Government's Share of the Pension Deficit Retained by CBS.**

     As the court explained in GE II, the payment obligation following a segment

closing calculation turns on the application of established contract principles and is not

governed by the CAS 413 calculation itself.  GE II, 84 Fed. Cl. at 147-49.  CBS makes

the same mistake the parties made in GE II by conflating the CAS 413 calculation with

the payment obligation.  See id. at 144 ("[B]oth parties have conflated the issue of

whether the segment closing adjustment calculation must be performed on the entire

segment with the issue of whether the transfer of a pension surplus by the plaintiffs, can,

in any way, be counted towards satisfaction of the plaintiffs' segment closing adjustment

obligations. . . . The original CAS requires that the pension assets and liabilities

attributable to the entire segment be included in the segment closing adjustment

calculation . . . . Whether the value of any transferred pension assets and liabilities in the

hands of the buyer can be counted to satisfy the seller's segment closing payment

obligation is an entirely separate question.").  Indeed, as this court held in Teledyne, Inc.

v. United States, 50 Fed. Cl. 155, 178 (2001), and the Federal Circuit affirmed sub nom.

Allegheny Teledyne, 316 F.3d 1366, not all costs identified in the segment closing

calculation are subject to a cost adjustment and thus not all are recoverable.

CBS argues that under the court's ruling in GE II, the government in this case must

pay CBS for the entire pension deficit, including the portion of the pension deficit it

transferred to Northrop Grumman, and that CBS will pass on to Northrop Grumman an

appropriate amount to cover the pension deficit it received.  A review of the GE II

decision demonstrates, however, that the payment issues in GE II and the payment issues

in this case are very different.  Accordingly, the outcome urged by CBS is not required by

that decision.

In GE II, GE had transferred, as part of a segment sale, a large pension surplus to

the segment buyer, Lockheed Martin.  The pension assets transferred by GE to the

segment buyer far exceeded the amount necessary to meet the pension obligations GE

transferred to the segment buyer as part of the same sale.  GE II focused on the net

surplus pension assets over and above the amount needed to meet the pension obligations

that were transferred to the segment buyer.  The segment buyer then used this surplus to

reduce a deficit in the pension costs incurred in the performance of other federal

government contracts.  In such circumstances, GE argued that the government could not

ignore the benefit that the government received when the GE-transferred, surplus pension

assets were used by the segment buyer to reduce a pension deficit on its other cost-type

government contracts, a deficit that the government would otherwise have been obligated

to pay.

The transferred surplus occurred because, as part of that same segment closing, GE

split the pension assets and liabilities for that segment into two parts.  The first part

contained pension assets and liabilities for the "active" employees of the segment (i.e.,

those employees who were still working).  The second part contained pension assets and

liabilities for the "inactive" employees (e.g., former employees who had since retired and

the beneficiaries of deceased retirees).  GE retained the inactive part but transferred the

active part to Lockheed Martin as part of the sale.  Both parts had pension surpluses.

Following the GE segment sale, the government claimed that it was entitled to a

share of the surplus pension assets of the inactive part (the part retained by GE) that

represented the portion of the surplus attributable to government contracts.  While it was not disputed that GE was required under the CAS to remit the surplus for the portion of the pension plans it retained, GE argued that its payment obligation was satisfied, at least in part, through the transfer of a large pension surplus for the active employees to the segment buyer, Lockheed Martin, who used that surplus to reduce pension costs tied to other federal government contracts.  GE noted that the government had approved the excess pension surplus transfer and that the Credits Clause, FAR 31.201-5, 48 C.F.R. § 31.205-5 (1998), states that a contractor may satisfy a segment closing adjustment obligation "either as a cost reduction or by cash refund."  GE argued that the surplus reduction the government achieved in the hands of the segment buyer satisfied its payment obligation to the government for the portion of the pension surplus attributable to the pension liabilities GE retained.[6]  GE argued that it was entitled to take credit for the transferred pension surplus because that surplus resulted in undisputedly reduced pension costs to the government on other government contracts with the segment buyer.

The government argued in GE II that GE had to pay to the government the government's share of the pension surplus on the pension liabilities retained by GE and that GE was not entitled to a credit for the pension surplus GE transferred to the segment buyer.  The government argued that the transferred pension surplus was irrelevant and that GE could not count a cost reduction in the hands of the segment buyer to satisfy its

---

[6]The transferred surplus was greater than GE's payment obligation.

payment obligations to the government.

The court agreed with GE and held that where the segment seller, with the government's knowledge and approval, transfers pension assets in excess of those necessary to meet the transferred pension liabilities, the government has to give the segment seller credit for the value of the benefit the government receives through pension cost reductions in contracts with the segment buyer.  GE II, 84 Fed. Cl. at 147-50.[7]  In particular, the court agreed that under the Credits Clause, the court had to consider the value of the transferred surplus in reducing pension costs the government would otherwise owe.

In this case, where there is a pension deficit instead of a surplus, the transfer of pension assets and liabilities to Northrop Grumman raises very different issues.  Here, the court must decide what the government must pay to make up for its share of the pension deficit identified in the segment closing calculation.  CBS argues that the government is liable to it for the full amount of the pension deficit, including the portion of the pension deficit transferred to Northrop Grumman, and that while it will transfer some of the payment to Northrop Grumman, to the extent that Northrop Grumman has made up a portion of the pension deficit with its own pension assets, Northrop Grumman will not get

---

[7]The court recently applied its holding in GE II to DirecTV Group, Inc. v. United States, 89 Fed. Cl. 302, 309-10 (2009).  In DirecTV, as in GE II, the court held that a segment seller was entitled to a credit for a transferred pension surplus against the seller's segment closing obligation.  Id.

it all.  CBS will retain any excess.[8]

The government argues in response that the government's obligation following a CAS 413 segment closing adjustment involving a deficit does not require the same result as in a surplus transfer situation under the applicable FAR provisions.  The court agrees. Here, the Credits Clause does not apply and, as discussed below, under the relevant FAR provisions, the government is not liable to CBS for the portion of the pension deficit that CBS transferred to Northrop Grumman.

**A.      The Government's Payment Obligation is Governed by the Allowable Cost and Payment Clause.**

To understand the government's payment obligation, it is necessary to review both the language of the Allowable Cost and Payment Clause as well as the court's earlier rulings.  The court begins with the first decision, Teledyne, 50 Fed. Cl. 155.

In Teledyne, the court held that "recovery of any pension plan surplus or deficit

---

[8]A numerical example may aid comprehension.  Assume that Company A sells Segment X to Company B.  As part of the sale, Company A effectively splits Segment X's pension plan in two, keeping the part that included retirees ("the retained part") and transferring the part that represented current employees to Company B ("the transferred part").  A segment closing calculation is performed and it is discovered that both parts have deficits.  The deficit for the transferred part is $100.  The $100 deficit, which was in the hands of Company A before the sale, is now in the hands of Company B.  Company B has other government contracts, and the pension plan has a $20 surplus attributable to these contracts.  The government would normally be required to make payments to Company B to cover the entire $100 deficit, but Company B uses the $20 surplus to reduce this deficit to $80.  Company A then seeks $100 from the government to cover the transferred deficit.  It acknowledges that it must transfer some funds to Company B, since Company B has taken over the plan that has this deficit.  However, Company A asserts that it is only required to transfer $80 to Company B, since that is the amount of the deficit remaining after Company B applied the $20 surplus from other government contracts to the $100 deficit. Here, CBS asserts that it can then keep the remaining $20 and apply it to another pension deficit not subject to reimbursement under CAS 413.

attributable to government contributions made under flexibly-priced contracts is recoverable in the current period at the time of the segment closing under the FAR Allowable Cost and Payment and Credits clauses." 50 Fed. Cl. at 183 (emphasis added). The Allowable Cost and Payment Clause, FAR 52.216-7, 48 C.F.R. § 52.216-7, is made up of several sections. Section (a) provides, in relevant part, that "[t]he Government will make payments to the Contractor . . . in amounts determined to be <u>allowable</u> . . . ." FAR 52.216-7(a)(1), 48 C.F.R. § 52.216-7(a)(1) (2002). Subsection (b)(2) sets forth special rules regarding which pension costs are allowable and provides that before an allowable pension cost may be reimbursed, the contractor must pay the contribution into the pension fund (as required by CAS 412).[9],[10] FAR 52.216-7(b)(2), 48 C.F.R. § 52.216-7(b)(2) (2002). <u>See</u> <u>Viacom</u>, 70 Fed. Cl. at 656.

The application of section (b) in cases involving pension deficits was addressed in <u>General Motors Corp. v. United States</u>, 66 Fed. Cl. 153, 158-59 (2005), and in <u>Viacom</u>, 70 Fed. Cl. at 656. In <u>GM</u> and <u>Viacom</u>, the court rejected the government's argument

---

[9]As the court explained in <u>Viacom</u>, the Allowable Cost and Payment Clause in effect at the time of the segment closing provided, in pertinent part, that the contractor must ordinarily pay the pension contribution into the pension fund in order to seek reimbursement from the government during contract performance. <u>See</u> <u>Viacom</u>, 70 Fed. Cl. at 656 n.5, (quoting 48 C.F.R. § 52.216-7(b)(2) (1996) ("'Contractor contributions to any pension . . . funds . . . may be included in indirect costs for payment purposes: Provided, That the Contractor pays the contribution to the fund . . .[ .]'")).

[10]CAS 412 governs the requirements for pension funding. <u>See</u> <u>Viacom</u>, 70 Fed. Cl. at 656 n.6 ("The original CAS 412 provides in pertinent part that pension costs may be allocated to a cost period if the contractor has paid or is liable for such payments. The revised CAS 412 was amended to expressly require funding." (citations omitted)).

that section (b) of the Allowable Cost and Payment Clause precluded the payment of

pension deficits, because deficits, by definition, involved pension costs that had not been

paid.  See GM, 66 Fed. Cl. at 157-58.  Instead, the court held that in the case of pension

deficits, section (b) did not apply.[11]  See Viacom, 70 Fed. Cl. at 656.

CBS argues that, based on the foregoing holdings, none of the limitations in the

Allowable Cost and Payment Clause should bar recovery of both the retained and

transferred pension deficits.  CBS argues that the Allowable Cost and Payment Clause

requirements, including allowability, are not applicable.  The court finds that CBS has

read too much into the court's prior holdings.  While the court in GM and Viacom

determined that the pension pre-payment section of the Allowable Cost and Payment

Clause did not apply in the case of segment closings, the court did not reject the

application of the Allowable Cost and Payment Clause altogether in the case of pension

deficits.  To the contrary, the contractor selling the segment must still establish that the

pension costs it seeks are "allowable" under section (a) of the Allowable Cost and

Payment Clause.  The court now turns to the question of what "allowable" means in this

context.

---

[11]The court further held, however, that the contractors would have to make sure that they
made up the pension deficit with the funds they received.  More specifically the court stated that
"although funding the deficit is not a prerequisite to recovery under CAS 413, Viacom will be
obligated to apply the funds it receives from the CAS 413 adjustment to the pension plan to
cover the portion of the deficit which Viacom has not paid."  Viacom, 70 Fed. Cl. at 656.

**B.     CBS Cannot Seek Pension Costs Attributable to Pension Liabilities Transferred to Northrop Grumman Under FAR 31.201-2.**

As noted above, in order to recover costs from the government, under the Allowable Cost and Payment Clause, FAR 52.216-7(a), 48 C.F.R. § 52.216-7(a), the costs must be "in amounts determined to be allowable by the Contracting Officer in accordance with [FAR] subpart 31.2[, 48 C.F.R. §§ 31.201 to 31.205]." FAR 31.201-2(a) (which is part of FAR subpart 31.2) provides, in relevant part, "[A] cost is allowable only when the cost complies with all of the following requirements: . . . (3) Standards promulgated by the CAS Board, if applicable, otherwise, generally accepted accounting principles [("GAAP")] and practices appropriate to the circumstances." FAR 31.201-2(a), 48 C.F.R. § 31.201-2(a) (emphasis added).

The government argues in its motion that CBS cannot recover pension costs attributable to the pension deficit CBS transferred to Northrop Grumman on the grounds that the costs are not "allowable." More specifically, the government argues that the pension costs CBS seeks are not allowable because CBS cannot meet the requirements of the CAS or GAAP. According to the government, allowability turns on CBS remaining liable for the pension payments under both the CAS and GAAP. As discussed below, the government is correct. Because CBS cannot meet the CAS or GAAP requirements for allowability under the FAR, CBS is not entitled to reimbursement for these costs (despite the fact that they must be included in the segment closing calculation).

Under original CAS 412, a contractor may only claim payment from the

-19-

government for pension costs if the contractor has a "valid liability."  Prefatory Comment

11 of Preamble A to CAS 412 explains:

> The underlying concept of [CAS 412] is that when a valid liability exists, the corresponding costs may be accrued irrespective of when the liability is liquidated.  <u>If the liability (to the pension fund or, for pay-as-you-go plans, to retirees) is not valid, it cannot be accrued</u>; in order for it to be allocated to cost objectives of the current period, it must be liquidated (funded) in that period or within a reasonable period of time thereafter.  In order to clarify its intent with regard to the allocation of pension costs to cost objectives of individual cost accounting periods, the [CAS] Board has revised the wording of [CAS] 412.40(c) [from what was originally proposed] . . . .

40 Fed. Reg. 43,873, 43,877 Pt. 412, Preamble A (Sept. 24, 1975) (emphasis added).

Original CAS 412 provides that "the cost assignable to a period is allocable to cost

objectives of that period to the extent that liquidation of the liability for such cost can be

compelled or liquidation is actually effected in that period."  CAS 412.40(c), 4 C.F.R. §

412.40(c) (1994).  Thus, it is clear that pension costs under CAS 412 may only be

reimbursed or paid by the government where the contractor has a valid "liability" for the

pension costs, i.e., the pension payment can be compelled by plan participants.

Although it is clear that payment by the government is only authorized when a

contractor can establish that it is liable for the pension payment, the term "liability" is not

specifically defined in the CAS.  It is, however, defined in GAAP.  As noted above, FAR

31.201-2, 48 C.F.R. § 31.202-2, provides that GAAP applies when CAS does not provide

an answer.  <u>Rumsfeld v. United Techs.</u>, 315 F.3d 1361, 1373 (Fed. Cir. 2003) ("GAAP

applies only when CAS itself does not provide the answer. . . . GAAP is an accepted

supplement to CAS, but only where CAS itself does not decide the issue."). Here, because the CAS does not define the term "liability," the court will look to GAAP.

The concept of "liability" is spelled out in Statement of Financial Accounting Concepts ("SFAC") No. 6 which is published by the Financial Accounting Standards Board, which in turn establishes GAAP.[12]  Financial Accounting Standards Board, SFAC No. 6, Elements of Financial Statements (Dec. 1985).  SFAC No. 6 defines "liability" to mean the "legal, equitable, or constructive duty or responsibility" to pay an obligation. Id. at 6-44, ¶ 200.  Under SFAC No. 6, liabilities are defined as "probable future sacrifices of economic benefits arising from present obligations of a particular entity to transfer assets or provide services to other entities in the future as a result of past transactions or events."  Id. at 6-13, ¶ 35.  Later in SFAC No. 6, paragraph 42 explains that if liabilities are transferred or eliminated, those liabilities can no longer be claimed by the transferring entity.  Id. at 6-15, ¶ 42.  In this paragraph, which falls under the heading, "Transactions and Events that Change Liabilities," GAAP recognizes that a liability may be eliminated if it is transferred to another.  Specifically, it provides that "[o]nce incurred, a liability continues as a liability of the entity until the entity settles it, or another event or circumstance discharges it or removes the entity's responsibility to settle it."  Id. (emphasis added).

Because it is not disputed that CBS is not responsible for paying the pension

---

[12]SFAC standards are considered to be a component of GAAP.

obligations it transferred to Northrop Grumman, CBS's responsibility for that portion of the segment's pension liability was therefore "discharged" or "removed."  Because CBS does not have any "liability" for the pension obligations it transferred to Northrop Grumman, paying CBS for the transferred pension deficit would violate the CAS and GAAP.  Thus, payment is not authorized under FAR 31.201-2 and is not permissible under the Allowable Cost and Payment Clause.[13]  Therefore, CBS's claim for pension costs attributable to the pension liabilities it transferred to Northrop Grumman must be

---

[13]CBS contends that if the government is not forced to pay CBS for the transferred pension deficit, the government will obtain a windfall in contravention of 41 U.S.C. § 422(h) (1999).  See GE II, 84 Fed. Cl. at 147-50 (holding that 41 U.S.C. § 422(h) prohibits the government from receiving a windfall; quoting 41 U.S.C. § 422(h)(3) ("In no case shall the Government recover costs greater than the increased cost . . . to the Government, in the aggregate, on the relevant contracts subject to the price adjustment, unless the contractor made a change in its cost accounting practices of which it was aware or should have been aware at the time of the price negotiation and which it failed to disclose to the Government.")).  CBS is mistaken.  In GE II, there was no dispute that the government had already received at least some pension cost reductions in the form of the transferred pension surplus in the hands of the segment buyer.  GE II, 84 Fed. Cl. at 148.  In such circumstances, requiring GE to make another payment to the government could have resulted in the government receiving a windfall.

In this case, however, there is no potential for the government to receive a windfall.  The government remains responsible for its share of the pension deficit transferred to Northrop Grumman as part of the government's ongoing liability for pension costs to Northrop Grumman.  Any benefit the government has received by virtue of the merger of the Northrop Grumman pension plan with the transferred pension plan is a benefit the government received from Northrop Grumman, not from CBS.  Therefore, CBS cannot receive a credit for any benefit that the government may have received from the merger of Northrop Grumman's pension plan with the transferred segment's pension plan.  Moreover, it is noteworthy that should Northrop Grumman's economic situation change and the pension plan go into deficit, the government will be obligated to give Northrop Grumman funds to make up that deficit under the CAS.  In short, the situation in this case, which involves a deficit, and the cases involving a surplus are not analogous.

denied.[14]

## CONCLUSION

For the above-stated reasons, the government is not liable to CBS for pension costs attributable to the pension deficit transferred to Northrop Grumman and CBS is not entitled to payment for that transferred deficit.  Accordingly, both parties' cross-motions for partial summary judgment are **GRANTED-IN-PART** and **DENIED-IN-PART**.

The parties will file a joint status report by **January 5, 2010** proposing the next steps for resolution of the case.  In detailing those steps, the parties should keep in mind that trial will be scheduled for June 2010.

**IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

---

[14]Again, the court emphasizes that the issue of what assets and liabilities must be included in a segment closing calculation is a different issue from what costs the government must ultimately pay to CBS.  As this case demonstrates, the segment closing calculation is not the final step in determining who must pay what to whom.