# In the United States Court of Federal Claims

No. 01-79C
(Filed: December 8, 2009)

```
* * * * * * * * * * * * * * * * * *   *
                                      *
CBS CORPORATION,                      *  Segment Closing Date under Original
                                      *  CAS 413, 4 C.F.R. § 413-50(c)(12)
            Plaintiff,                *  (1986); Segment Closed when
                                      *  Contractor Stopped Performing on
      v.                              *  Government Contract and Stopped
                                      *  Incurring any Direct Labor Charges.
THE UNITED STATES,                    *
                                      *
            Defendant.                *
                                      *
* * * * * * * * * * * * * * * * * *   *
```

*Thomas A. Lemmer,* Denver, CO, for plaintiff. *Herbert L. Fenster*, of Washington, DC, *Mark J. Meagher* and *Arash Heidarian*, of Denver, CO and *Eric J. Sobczak*, Pittsburgh, PA, of counsel.

*David D'Alessandris,* U.S. Department of Justice, Washington, DC, with whom were *Tony West, Assistant Attorney General* and *Director Jeanne E. Davidson*, for defendant. C. Coleman Bird, U.S. Department of Justice, Washington, DC and *Lawrence S. Rabyne*, Defense Contract Management Agency, Arlington Heights, IL, of counsel.

**O P I N I O N**

Pending before the court are the parties' cross-motions for partial summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC") regarding the proper date for the segment closing of Westinghouse Electric Corporation's ("Westinghouse's") Machinery Technology Division ("MTD") under the original version of Cost Accounting Standard ("CAS") 413.50 (c)(12) ("CAS 413" or

"Original CAS 413"), 4 C.F.R. § 413-50(c)(12) (1986).[1] Westinghouse, now CBS Corporation ("CBS") and formerly Viacom, Inc., contends that the segment closed on February 1, 1996, when MTD closed its plant and transferred all remaining work on its sole government contract to another Westinghouse segment. The defendant, the United States ("government"), contends that the MTD segment was not "closed" for CAS 413 purposes until July 31, 1997, when all of the subcontractor's work on MTD's government contract was concluded.

This is the third decision in this case. Previously, the court granted-in-part and

---

[1] This case involves the allocation of pension assets and liabilities following the closing of a segment under the original version of CAS 413.50(c)(12). For convenience, references to the original version shall simply be to "CAS 413" or "original CAS 413." References to the revised version, found at 48 C.F.R. § 9904.413-50(c)(12) (1995), shall be to "revised CAS 413." Original CAS 413 states, in relevant part,

> If a segment is closed, the contractor shall determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated. The determination of the actuarial liability shall give consideration to any requirements imposed by agencies of the United States Government. In computing the market value of assets for the segment, if the contractor has not already allocated assets to the segment, such an allocation shall be made in accordance with the requirements of paragraph (c)(5)(i) and (ii) of this section. The market value of the assets allocated to the segment shall be the segment's proportionate share of the total market value of the assets of the pension fund. <u>The calculation of the difference between the market value of the assets and the actuarial liability shall be made as of the date of the event (e.g., contract termination) that caused the closing of the segment.</u> If such a date cannot be readily determined, or if its use can result in an inequitable calculation, the contracting parties shall agree on an appropriate date. The difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously-determined pension costs.

42 Fed. Reg. 37,191, 37,198 (Jul. 20, 1977) (emphasis added). There is no definition of "closed" or "closing" in original CAS 413.

denied-in-part the government's motion for partial summary judgment on whether the government was liable under CAS 413 for a portion of the pension plan deficit retained by CBS following the segment closing.  Viacom, Inc. v. United States, 70 Fed. Cl. 649 (2006), amended by CBS Corp. v. United States, 75 Fed. Cl. 498 (2007).  The court also issues today a decision regarding the extent of the government's payment obligation with regard to the sale of another segment, the Electronic Systems Group.  See CBS Corp. v. United States, No. 01-79 (Fed. Cl. Dec. 8, 2009) (opinion regarding segment closing calculation).  The court in this decision addresses only the date of the MTD segment closing.  This date is significant because under CAS 413, the calculation of the closed segment's pension assets and actuarial liability must be made as of the date of the segment closing.  42 Fed. Reg. at 37,198.  Therefore, the issue of the closing date must be resolved in order to make the appropriate segment closing calculation, which includes the calculation of interest.

For the reasons set forth below, the court finds that there are no material facts in dispute to preclude resolution of this issue on cross-motions for partial summary judgment and that based on the undisputed facts, the court finds that the segment closed on February 1, 1996.

## UNDISPUTED FACTS

The following facts are not in dispute.  In 1983, Westinghouse established MTD to provide technical and engineering support to the Naval Sea Systems Command

("NAVSEA").  Westinghouse designated MTD as a "segment" for CAS purposes.

MTD was awarded two government contracts.  On or about December 28, 1983, NAVSEA awarded Contract No. N00024-84-D-4312 ("Contract No. 4312" or "the 4312 Contract") to MTD.  Contract No. 4312 was an incrementally-funded cost-plus-fixed-fee contract, incorporating by reference Defense Acquisition Regulation ("DAR") 7-104.83(a)(1)), 32 C.F.R. § 7-104.83(a)(1) (1978), which required contractor compliance with the CAS.  Thereafter, in 1986, NAVSEA awarded MTD a follow-on, incrementally funded cost-plus-fixed-fee contract, Contract No. N00024-86-C-4030 ("Contract No. 4030" or "the 4030 Contract").  Deliverables under Contract No. 4030 included technical instructions for the Superconducting Magnetic Energy Storage Development Program ("SMES").  Contract No. 4030 incorporated by reference Federal Acquisition Regulation 52.230-3, 48 C.F.R. § 52.230-3 (1984), which required contractor compliance with the CAS.

MTD's employees (who numbered approximately 190 at any given time) participated in either the Westinghouse Qualified Pension Plan ("WQPP") or the Westinghouse Executive Pension Plan ("WEPP").  Each year, Westinghouse allocated to MTD a pro rata portion of its employees' pension costs based upon MTD's labor costs and then recovered these pension costs from the government by allocating the costs to its government contracts based upon MTD's labor costs.

By 1995, MTD had completed performance under the 4312 Contract.  Thereafter,

MTD's business consisted solely of work remaining under Contract No. 4030. To perform this contract, MTD entered into several subcontracts, including a subcontract with another Westinghouse segment, Science and Technology Center ("STC"). STC employees also participated in Westinghouse's pension plans.

On November 13, 1995, NAVSEA informed MTD that it would not be awarded the follow-on contract to Contract No. 4030. On November 20, 1995, Joseph Bauer, the controller for MTD, sent a letter to John Dennard ("Mr. Dennard"), the contracting officer at NAVSEA, regarding its intention to close the MTD segment. In this letter, MTD notified Mr. Dennard that it would cease operations as a result of not receiving the follow-on contract and that MTD would begin to issue to its employees the sixty-day advance plant closing notice required by law. MTD stated that it was ceasing operations because of its concern that funds under the 4030 Contract were not sufficient to cover MTD's segment closing costs. In particular, MTD gave notice under the terms of Contract No. 4030's Limitation of Funds clause[2] that MTD expected that the total cost of

---

[2]This clause incorporated by reference a mandatory FAR clause that provides a procedure by which the contractor may cease performance when funds run out. It provides, in pertinent part,

> The Contractor shall notify the Contracting Officer in writing whenever it has reason to believe that the costs it expects to incur under this contract in the next 60 days, when added to all costs previously incurred, will exceed 75 percent of (1) the total amount so far allotted to the contract by the Government or, (2) if this is a cost-sharing contract, the amount then allotted to the contract by the Government plus the Contractor's corresponding share. The notice shall state the estimated amount of additional funds required to continue performance for the period specified in the Schedule.

performance under Contract No. 4030 would be greater than originally estimated and that "Westinghouse does consider this a segment closing and as such, the pension related costs could be significant." App. to Def.'s Mot. A1. On December 4, 1995, MTD notified its employees that the MTD segment would close on February 1, 1996 and gave its employees the legally required, sixty-day notice.

By letter dated December 8, 1995, Mr. Dennard of NAVSEA wrote to MTD that the Navy did not intend to provide additional funding under the 4030 Contract. In a responsive letter dated December 14, 1995, Mr. Bauer, on behalf of MTD, wrote, "We currently estimate that costs incurred exceed the obligated amount by approximately $14[ million]. In addition, there are costs relating to unfunded pension liability of the [ ]MTD business segment of approximately $9[ million]." App to Def.'s Mot. A4.

Thereafter, by letter dated January 2, 1996, MTD informed the contracting officer that

> a [c]orporate business decision has been made to close the MTD division . . . effective February 1, 1996. . . .
>
> The immediate effect of this decision requires that we now discontinue all active task (Technical Instruction) efforts in order to provide a final status report on all [Technical Instruction]s by 2/1/96, at which time all direct labor charges to the contract will cease. Outside procurements and other non-salary expenditures will be cancelled as of 1/5/96 [with certain designated exceptions].

Id. at A5. By letter dated January 5, 1996 and entitled "Subject: Limitation of Costs

---

48 C.F.R. § 52.232-22(c) (1996). The current version of this FAR clause contains identical language.

Notification," Mr. Bauer responded to Mr. Dennard's December 14, 1995 letter, informing him that "[t]otal costs expected to be incurred under [Contract No. 4030,] including costs arising from CAS 413[,] are estimated to be $259,067,909," and that the contract had "currently allotted funds of $238,267,909 resulting in a projected shortfall of $20,800,000." Id. at A7.

In keeping with its decision to shut down its facilities by February 1, 1996, MTD sent its subcontractors formal notice of terminations of convenience effective January 18, 1996. On January 19, 1996, MTD requested that its employees' secret facility clearances be terminated as of February 1, 1996.

Prior to January 23, 1996, the government requested that MTD continue performance under the 4030 Contract because the government had determined that MTD's segment closing costs would be reimbursed from funds unrelated to the appropriated funds under the 4030 Contract and that funds under the 4030 Contract had not been fully expended. Mr. Dennard, the contracting officer, asked Westinghouse to continue work on the SMES for national defense reasons. As a result, MTD agreed to reinstate its subcontracts and transfer the SMES work to STC.

Before agreeing to reinstate the subcontracts and transfer the SMES work to STC, MTD sought assurance from the Navy that this action would not prejudice Westinghouse from pursuing a claim for recovery of its closing costs. On January 24, 1996, the contracting officer indicated in a letter to Westinghouse that the Navy could not transfer

7

contract funds directly to STC to perform the remaining SMES work and therefore MTD would need to continue to bill for the work under the 4030 Contract. In a January 26, 1996 letter, Mr. Dennard stated that "[i]t is NAVSEA's strong desire that SMES continue under the contract as funds under the subline item remain available. Continuation of the [project] work will in no way preclude Westinghouse MTD from seeking, at a future date, to recover costs to which you believe you are entitled." Ptf.'s Proposed Findings of Controverted Fact ("PPFUF") ¶ 31. Thereafter, MTD rescinded its termination notice to STC and transferred all responsibility under the 4030 Contract to STC. However, under its arrangement with NAVSEA, MTD would continue to do the billing.

January 31, 1996 was the last day of work for approximately 165 of MTD's 190 active employees. On February 1, 1996, the government administratively terminated MTD's facility security clearances. Thereafter, STC division performed all direct labor, including subcontract management under the 4030 Contract. Westinghouse was unable to allocate pension costs to the MTD segment after the work was subcontracted to STC, using its existing cost accounting practice of allocating pension cost based upon direct labor (i.e., work performed by MTD employees themselves and not subcontractors hired by MTD).

Between February 1, 1996 and March 1, 1996, MTD retained a closeout team of approximately twenty-five employees to assist in the MTD shutdown. By May 1, 1996, there were only two MTD employees remaining. These employees were not performing

work under the contract, but were involved solely in the winding-down of the segment and in performing the billing functions requested by the government.

The Defense Contract Audit Agency ("DCAA") audited MTD's plant closings after the MTD facility closed. When the DCAA presented questions to MTD in April 1996, MTD advised the DCAA that it could not respond because MTD no longer had any employees.

On July 29, 1996, the government and Westinghouse entered into Modification No. P00383 under Contract No. 4030, which extended the period of performance of this contract (on a specified technical instruction) to July 31, 1997. The work identified in the Modification was performed by STC. Beginning in March 1996, Westinghouse submitted eighteen vouchers to the government under Contract No. 4030. No vouchers submitted under Contract No. 4030 after February 1996 contained any cost for performance of any work under Contract No. 4030 by MTD employees after February 1, 1996.

On September 21, 1999, the DCAA issued Audit Report No. 6701-99W10250011, related to MTD's fiscal year 1996 incurred costs. In the audit report, the DCAA stated that "[a]s of March 1, 1996, [MTD] ceased to exist as a viable ongoing entity." Ex. 4 to PPFUF. On April 8, 2002, the DCAA issued a supplement to that audit report in which it stated that MTD "laid off a significant number of its employees in early 1996 (February and March) following that facility's failure to obtain a follow-on contract . . . ." Ex. 5 to PPFUF.

The Defense Contract Management Agency ("DCMA") performed two "Special Contractor Insurance/Pension Reviews" ("CIPRs") related to MTD's pension segment closing claims, dated April 22, 2003. The CIPR report related to the WEPP segment closing claim stated:

> The CIPR Center has reviewed the CAS 413.50(c)(12) calculation of the Actuarial Accrued Liability. The Segment Closing determination is February 1, 1996. According to the information provided by Westinghouse, the NAVSEA contract was not to be renewed and all employees ceased work under this contract as of 31 January 1996. <u>Thus the Segment Closing is deemed to have occurred as of 1 February 1996.</u> We find this determination to be a reasonable one in this case.

App. to Def.'s Mot. A83 (emphasis added). In the CIPR related to the WPPP segment closing claim, DCMA again stated that the MTD segment closing date was February 1, 1996.[3] Id. at A88.

It is not disputed that prior to the commencement of this litigation, the government never argued that MTD did not close on February 1, 1996.

## DISCUSSION

**I.    Standard of Review**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." RCFC

---

[3]Westinghouse submitted two claims relating to its pension plans to the Defense Logistics Agency ("DLA") on December 3, 1996. The DLA has never issued a final decision on these claims.

56(c)(1); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008); Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1323 (Fed. Cir. 2001) (citation omitted). In considering a motion for summary judgment, the court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 249. "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Lathan Co., Inc. v. United States, 20 Cl. Ct. 122, 125 (1990); Casitas Mun. Water Dist., 543 F.3d at 1283.

## II.   The MTD Segment Closed on February 1, 1996.

### A.   Positions of the Parties

At issue in these cross-motions for summary judgment is the proper interpretation of the segment closing language of original CAS 413. As noted above, a segment closing occurs under CAS 413 on the "date of the event" which prevents the adjustment of the segment's previously determined pension costs to account for past over- or under-charges of pension costs to the segment's CAS-covered contracts. 4 C.F.R. § 413-50(c)(12); see Teledyne v. United States, 50 Fed. Cl. 155, 164, 170-71 ("The CAS 413 segment closing adjustment was triggered because Teledyne retained responsibility for the pensions, but not the contracts over which the gains and losses attributable to the government's share of

pension costs would ordinarily be amortized."), aff'd sub nom. Allegheny Teledyne v. United States, 316 F.3d 1366 (Fed. Cir. 2003). Specifically, CBS argues that a segment closing occurred in this case when the segment stopped performing CAS-covered contracts that would allow for amortization of pension costs. CBS argues that MTD closed on February 1, 1996, because as of that date MTD: (1) transferred all work under Contract No. 4030 to STC, a separate Westinghouse business segment, and MTD was no longer responsible for work under Contract No. 4030 (except for billing, as requested by the government); (2) terminated most of its employees (except those needed for closing down the facility); (3) its employees lost their security clearances and therefore could no longer perform work under Contract No. 4030; and (4) stopped billing the government for MTD's direct and overhead costs, including its pension costs. In view of these undisputed facts, CBS argues that after February 1, 1996, there was no contractual mechanism for adjusting MTD's pension costs and the segment was therefore closed for CAS 413 purposes. CBS also argues that its view is supported by revised CAS 413, amended in 1995, which provides that a segment closing occurs when a contractor has "discontinued operations."[4]  CAS 413.30(a)(20), 48 C.F.R. § 9904.413.30-(a)(20) (1995).

---

[4] In the preamble to revised CAS 413's definition of a segment closing, the CAS Board stated that a definition of "segment closing" was added to the CAS because original CAS 413 did not contain a definition of "segment closing" and was otherwise "incomplete and unclear."  60 Fed. Reg. 16,534, 16,535 (Mar. 30, 1995).  Because the 1995 CAS Board acknowledged that the original CAS language was incomplete as well as unclear, the court disagrees with CBS that revised CAS 413 is helpful in determining the meaning of original CAS 413.  In this situation, unlike in other cases involving CAS 413, See, e.g., Gen. Motors Corp. v. United States, 78 Fed. Cl. 336, 349 (2007) (holding that the 1995 CAS Board's prefatory comments to another section

The government contends that under original CAS 413, a segment with a single CAS-covered contract, such as MTD, does not close until the contractual relationship is finally terminated and "it is no longer <u>possible</u> to adjust pension costs charged to that CAS-covered contract to account for past over[-] or under[-]charges of pension cost to the segment's contacts." Def. Reply Br. 4 (emphasis added). Tested by its proposed interpretation of CAS 413, the government contends that the MTD segment did not close until July 1, 1997, because Contract No. 4030 indisputably remained open until that time and therefore it was "possible" to adjust MTD's pension costs. The government argues that because contract work under Contract No. 4030 was performed by Westinghouse's STC segment, it was "possible" for MTD to have coordinated actions with STC that would have allowed MTD to adjust pension costs had Westinghouse elected to do so. In addition, the government argues, because STC employees were covered by the same Westinghouse pension plans as MTD's employees, the government was, in effect, adjusting MTD's pension costs when STC charged pension costs to the government under Contract No. 4030. According to the government, the deficit in Westinghouse's pension plans was reflected in the costs charged by STC to the government.

---

of CAS 413 indicated that the Board did not view its revisions as a change from what the original CAS required, therefore permitting the court to look to the revised version to aid in interpreting the original version), it is clear that the 1995 CAS Board, understood that it was making a change from the pre-existing CAS in defining a segment closing. Therefore, the revised CAS definition is not helpful in determining whether MTD closed once it stopped performing on Contract No. 4030. Accordingly, the court will not consider the revised CAS in determining when the segment closed in this case.

13

### B.      The MTD Segment Closed on February 1, 1996.

As noted above, this court has held, and the Federal Circuit has affirmed, that the critical test for determining whether a segment closing has occurred is whether there are future cost accounting periods in which to adjust previously determined pension costs. Teledyne, 50 Fed. Cl. at 170-71; Allegheny Teledyne, 316 F.3d 1366.  In determining whether there is a segment closing upon the sale of a segment, the court relied upon the CAS Board's statement in the Preamble to CAS 413, stating that "where 'there are no future periods in which to adjust previously-determined pension costs applicable to that segment,' the contractor must perform a final segment closing adjustment." Teledyne, 50 Fed. Cl. at 171, quoting 4 C.F.R. § 413, pmbl. A § 12 (1986).  The court also relied upon the CAS Board's Illustration No. 8, CAS 413.60(c)(8), 4 C.F.R. § 413.60(c)(8) (1986), in which the CAS Board made clear that a contractor's loss of its only government contract (a contract to operate a government-owned, contractor-operated facility) constituted a segment closing that required an adjustment of previously-determined pension costs. Id. Elsewhere, the preamble states that the "completion of a contract" or an "organizational change" are other ways in which a segment could be closed. See 4 C.F.R. § 413, pmbl. A § 12 (segment closing provisions apply whenever a segment is closed, "irrespective of whether the closing is caused by the completion of a contract or an organizational change").  Finally, after reviewing this same regulatory history, the Federal Circuit stated, "[T]he Board intended the segment closing provision to apply in situations where 'there

14

are no future periods in which to adjust' the appropriate costs.  Thus, <u>it applies to situations where, for whatever reason, the segment's contracts have become separated or closed off from the pension costs.</u>" Allegheny Teledyne, 316 F.3d at 1374 (quoting 4 C.F.R. § 413, pmbl. A (citation omitted) (emphasis added)).

There is no doubt that if MTD had simply ceased to perform Contract No. 4030 and had not subcontracted the remaining work to STC, a segment closing would have occurred on February 1, 1996.  Indeed, this is what MTD originally intended to do in late 1995 when it contacted NAVSEA to notify it of MTD's intent to close the segment and subsequently notified its employees of its intention to close the segment on February 1, 1996.  It is undisputed that once MTD learned that it had not received the follow-on contract to support NAVSEA that the MTD segment began the process of closing down.  The undisputed facts establish that MTD closed its offices, terminated nearly all of its employees, relinquished its facility security clearances and terminated its subcontracts in anticipation of the February 1, 1996 closing date.  It is also not disputed that while MTD subcontracted performance under the contract to STC, MTD remained the prime contractor on Contract No. 4030 after NAVSEA prevailed upon MTD to assume that role for funding and national security reasons.  The record demonstrates that if NAVSEA had not prevailed upon MTD to retain its prime contractor status, the timing of the segment closing in this case would not be in dispute.  Once MTD had ceased work on Contract No. 4030, following termination of its security clearance and after it transferred the contract work to STC, it would have been "closed."

However, in this case, NAVSEA prevailed upon MTD to remain the prime contractor on Contract No. 4030 and for the next eighteen months MTD submitted bills to the government on behalf of its sister segment and subcontractor, STC, at the government's request. Therefore, the court must now determine whether as a matter of fact and law, MTD's continued status as the prime contractor on Contract No. 4030, which it maintained for billing purposes at the request and instigation of the government, kept the MTD segment "open," as the government contends, or whether Contract No. 4030 became separated or closed-off from MTD's pension costs as of February 1, 1996, thereby closing the segment on that date regardless of the fact that MTD continued as the prime contractor, as CBS contends.

Whether MTD was closed as of February 1, 1996 turns on whether the government's contentions regarding the relationship between MTD and STC are correct. More specifically, the court must determine whether MTD's pension deficit was, in fact, being adjusted after MTD subcontracted all of the work on Contract No. 4030 to STC. The government argues that because STC charged pension costs for the direct labor its employees performed, the pension asset deficit attributable to MTD was "adjusted" through the overhead rate charged by STC under Westinghouse's composite accounting approach. Under this view, actuarial gains and losses attributable to the MTD segment were reflected in STC's overhead rate and were thereby passed through to the government by STC. Def.'s Reply at 11. In the alternative, the court must determine whether MTD

16

remained open because MTD had the ability to adjust its pension costs after February 1, 1996 by filing a new CAS disclosure statement with the government modifying the allocation of pension costs to the government on a basis other than direct labor. The government contends that even though MTD was no longer incurring pension costs through direct labor, MTD's pension costs "could have been" adjusted through 1996 and 1997 if MTD had changed its CAS disclosure statement and allocated pension costs on some other basis. Id. at 11-12.[5] According to the government, the possibility of allocating pension costs under an open CAS contract is enough to keep the segment "open." Id. at 10-12.

CBS argues that the government's contentions are not supported. First, CBS argues that MTD's pension costs were not and could not be adjusted through STC's billings. CBS argues that the purpose of the CAS 413 segment closing adjustment is to make certain that any pension asset surplus or deficit attributable on a composite basis to the closed segment is not adjusted through government payments to other segments. Thus, argues CBS, if a segment is no longer charging any costs to the government, it cannot seek to recover one segment's pension costs through another segment. CBS contends that original CAS 413 does not allow one segment to adjust its previously

---

[5] The government acknowledges that this would have been a change to accounting practices which could entitle the government to an equitable adjustment under FAR 52.230-2. Def.'s Reply Br. 11. Thus, the government would have been entitled to a refund of any increased costs it incurred by virtue of this accounting change. See Teledyne, 50 Fed. Cl. at 186 (explaining how the equitable adjustment works).

determined pension costs through costs charged by another segment.  Second, CBS asserts that CAS 413 does not allow a segment that has stopped doing government work to modify its basis for allocating pension costs to a government contract in order to charge additional pension costs.  Therefore, CBS argues, MTD was not authorized under the CAS to modify its allocation of pension costs to a basis other than direct labor, in order to allocate MTD pension costs to a contract the segment was not performing.  For these reasons, CBS urges that the government's arguments must fail and the court must recognize that the MTD segment closed when it stopped performing under Contract No. 4030 as of February 1, 1996.[6]

The court agrees with CBS.  While it is no doubt true that MTD remained the prime contractor under Contract No. 4030 after February 1, 1996 for billing purposes only in order to help the government, it is also true that under CAS 413, MTD was not able to charge pension costs to the government based on direct labor rates under Contract No. 4030 after it had ceased operations on February 1, 1996.  Accordingly, the MTD segment closed as of that date.

The government's contention that the MTD segment was not closed because a portion of MTD's pension asset deficit was reflected in STC's overhead rate under Contract No. 4030 and therefore "indirectly" charged to the government is not supported.

---

[6]CBS also notes that the government did not take issue with the DCAA's and CIPR's use of February 1, 1996 as the date of the MTD segment closing until commencement of this litigation.

The court agrees with CBS that the purpose of the CAS 413 segment closing adjustment is to prevent a segment from passing on its pension asset surplus or deficit to another segment within a company. If that were allowed, companies could avoid segment closings by merging segments and either retain a pension asset surplus or grow a pension asset deficit in contravention of the CAS rules regarding segment allocation. As discussed above, the purpose of the segment closing adjustment is to balance the books with regard to the individual segment after it stops performing government work. See Teledyne, 50 Fed. Cl. at 171. When a final segment closing calculation is performed for the MTD segment, it should account for any pension deficit charged "indirectly" to the government by STC and return those funds to the government to avoid double-payment.

The court also agrees with CBS that under CAS 413, MTD could not change its pension cost allocation basis from direct labor to another basis in order to collect pension costs from the government when it was no longer incurring direct labor charges. The government has not identified any accounting justification for MTD to have charged pension costs to the government under Contract No. 4030 when it was not incurring any direct labor charges. As discussed above, STC, a separate segment from MTD, was providing all of the direct labor. In such circumstances, MTD would not have been allowed to charge pension costs through to the government.

Thus, the government's claim that MTD did not "close" on February 1, 1996 because it retained the "ability" to charge pension costs while STC was finishing up work

on Contract No. 4030 is not supported. The fact that MTD continued as the prime contractor for billing purposes did not change the actual and legal fact that MTD, itself, ceased to exist as a segment capable of charging pension costs on February 1, 1996. Accordingly, the date of the segment closing was February 1, 1996.

## CONCLUSION

For the above-stated reasons, CBS's motion for partial summary judgment is **GRANTED** and the government's motion for partial summary judgment is **DENIED**.

**IT IS SO ORDERED.**

s/Nancy B. Firestone<br>
NANCY B. FIRESTONE<br>
Judge